**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **COMPLAINT** |
| **STATE OF COLORADO,** | |
| **Defendant.** | |

**INTRODUCTION**

1.      Thousands of Coloradans with physical disabilities are unnecessarily segregated or at risk of being unnecessarily segregated in nursing facilities due to the State's failure to make community services available to them.

2.      People with physical disabilities, including older adults, often need help with their daily activities and to care for their health conditions.  For example, some people with chronic health conditions, like diabetes, may need daily help taking and keeping track of their medications. Others need help getting dressed, bathing, or eating because of mobility challenges caused by disabilities like multiple sclerosis, severe arthritis, spina bifida, or paralysis.

3.      Like other states, Colorado funds and administers services, through Medicaid and other publicly funded programs, for their low-income residents who have physical disabilities.  The services Colorado provides include nursing services; speech, physical, and occupational therapy; help getting and keeping track of medicines and medical equipment, like a wheelchair or a

ventilator; help finding and maintaining housing; and help with everyday activities, like using the bathroom, taking a bath, getting dressed, and eating.

4.      These services can be provided to people in their own homes.  But thousands of people with physical disabilities in Colorado can only access these services by giving up their homes and moving into a nursing facility.

5.      Each year, many Coloradans with physical disabilities move into nursing facilities after becoming injured, sick, or homeless, or when friends, relatives, or paid caregivers can no longer take care of them.

6.      For some, a brief rehabilitative stay turns into a long-term nursing facility placement when the State does not provide the services they need to move back to their homes.  As a result, some people who want to return home have stayed in nursing facilities for many years.

7.      In 1990, Congress passed the Americans with Disabilities Act (the "ADA"), which recognized that historically, society has discriminated against people with disabilities by isolating and segregating them away from their communities.  So, in Title II of the ADA, Congress prohibited states from needlessly segregating people with disabilities.  When a state provides services to people with disabilities, it must provide those services in the most integrated setting appropriate to recipients' needs unless doing so would fundamentally alter its service system.  This allows people who receive these services to live and participate in their communities, alongside their non-disabled family members, friends, and neighbors, rather than being separated from society.

8.      Most Coloradans with physical disabilities who have had to move to nursing facilities (the "Institutionalized Individuals") could live at home, alone or with family or friends, if they could access the services they need there.

9.      Many of these people would choose to live in the community if provided a meaningful opportunity to do so.

10.     Coloradans with physical disabilities who are at serious risk of institutionalization (the "At-Risk Individuals") currently live in the community but might have to move to nursing facilities in the near future to receive the services they need.  At-Risk Individuals generally want to stay in the community.

11.     Moving into a nursing facility not only separates people from their communities, but also deprives them of the ability to make basic choices about their daily lives.  For example, most nursing facility residents cannot choose their roommate, what they eat, or how they spend their days.

12.     Entering a nursing facility can also lead to bad health outcomes.  People's physical, emotional, and mental health can worsen when they are separated from their communities, friends and families, and opportunities to be active and independent.  For example, nursing facility staff members, in a hurry to get many residents to the dining hall for mealtimes, tend to push residents in wheelchairs even if the residents' mobility impairments are modest.  As a result, even though these residents are capable of walking with walkers or canes, or "self-propelling" their own wheelchairs, they do not do so.  Nursing facility residents have little to do, so even people who can move around tend to spend all day in bed or in a chair.  And people who

once did all or some of their own chores—like laundry, meal preparation, and bill paying—lose those skills in facilities where staff members do these tasks for them.

13.     As the COVID-19 pandemic made clear, segregating people with disabilities in nursing facilities also makes them uniquely vulnerable to easily transmissible infections, loneliness, and extreme loss of liberty.

14.     In 2020, the State acknowledged in a strategic action planning document that "those who are older and living in congregate care settings are significantly more at risk [of mortality as a result of COVID-19] than community-dwelling older adults."  Indeed, more than 2,000 Colorado nursing facility residents have died of COVID-19.

15.     The State could prevent discrimination against Coloradans with physical disabilities by changing its policies and practices to ensure that people have the information they need to make a meaningful choice about staying at home or moving into a nursing facility; to make services in the community more reliably available; and to make it easier for people to stay in their homes, or to move back to the community when they are ready.

16.     The United States has received several complaints alleging disability discrimination against Colorado nursing facility residents.  These complaints alleged that people with disabilities wanted to live in the community but were stuck in Colorado nursing facilities because State policies and practices made it hard for them to move back to their homes.

17.     The United States brings this lawsuit, seeking a judicial order compelling the State to make reasonable modifications, as the ADA requires, to its services for low-income Coloradans with physical disabilities.  Changes to the State's policies and practices would enable many more

Coloradans with physical disabilities to live in their homes, contribute to their communities, and develop and maintain bonds with their friends and loved ones.

## JURISDICTION

18.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, because it involves claims arising under federal law.  *See* 42 U.S.C. § 12133.  The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201–02.

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to this action occurred in the District of Colorado.  28 U.S.C. § 1391(b).

## PARTIES

20.    Plaintiff is the United States of America.

21.    Defendant, the State of Colorado, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131–34, and its implementing regulation, 28 C.F.R. Part 35.

## STATUTORY AND REGULATORY BACKGROUND

22.    Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  It found that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  *Id*. § 12101(a)(2).

23.    For those reasons, Congress prohibited discrimination against individuals with disabilities

by public entities: "[N]o qualified individual with a disability shall, by reason of such disability,

be excluded from participation in or be denied the benefits of the services, programs, or activities

of a public entity, or be subjected to discrimination by any such entity."  *Id.* § 12132.

24.    Title II of the ADA prohibits discrimination on the basis of disability by public entities.

A "public entity" includes any state or local government, as well as any department, agency, or

other instrumentality of a state or local government, and it applies to all services, programs, and

activities provided or made available by public entities, such as through contractual, licensing, or

other arrangements.  *Id.* § 12131(1); 28 C.F.R. § 35.130(b)(3)(i).

25.    Congress directed the Attorney General to issue a regulation implementing Title II of the

ADA.  42 U.S.C. § 12134.  The Title II regulation includes an "integration mandate," which

requires public entities to "administer services, programs, and activities in the most integrated

setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

The most integrated setting is one that "enables individuals with disabilities to interact with

nondisabled persons to the fullest extent possible . . . ."  *Id.*, App. B., at 711 (2020).

26.    In *Olmstead*, the Supreme Court held that Title II prohibits the unjustified segregation of

individuals with disabilities.  527 U.S. 581, 597 (1999).  The Court explained that its holding

"reflects two evident judgments."  *Id.* at 600.  "First, institutional placement of persons who can

handle and benefit from community settings perpetuates unwarranted assumptions that persons

so isolated are incapable or unworthy of participating in community life."  *Id.*  "Second,

confinement in an institution severely diminishes the everyday life activities of individuals,

including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

27.    Under Title II, as interpreted by the United States Supreme Court in the *Olmstead* decision, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected individuals do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other people with disabilities. *Id.* at 607.

### COLORADO'S SERVICE SYSTEM FOR ADULTS WITH PHYSICAL DISABILITIES

28.    Colorado administers and funds services for adults with physical disabilities through various agencies, departments, and programs.

29.    Low-income individuals with physical disabilities typically need long-term care services delivered where they live, which are frequently referred to as "long-term services and supports," or "LTSS." LTSS include nursing care, medication management, therapies, care planning, dietary services, and personal care services. LTSS provide recipients with medical care and help with "activities of daily living." Activities of daily living, or "ADLs," include tasks associated with personal hygiene, toileting, dressing, getting in and out of bed or a chair, walking, and eating.

30.    Colorado uses Medicaid financing to fund and administer most of these services. Some of the State's service recipients receive these services in nursing facilities, while others receive the services in home- and community-based settings (*e.g.*, in their private owned or rented home).

31.     Medicaid is a health care system created by federal law but administered by states who are subject to certain federal statutory requirements.  In broad terms, Medicaid's purpose is to provide government-funded health coverage and related services for low-income individuals and individuals with disabilities.  When these individuals receive authorized services from providers that are enrolled with Medicaid, the providers' costs are reimbursed with Medicaid funds.

32.     Federal law requires every state that participates in Medicaid to designate a state agency to administer its Medicaid services.  That agency must create a "Medicaid State Plan," which describes and defines the services that it will cover through Medicaid.  These services are called "medical assistance."

33.     The state agency may provide certain home- and community-based services (or "HCBS") for people with disabilities through so-called "Medicaid waivers."[1]  Services provided through these waivers are "medical assistance" under the State Plan.

34.     The state agency that administers Colorado's Medicaid system is the Department of Health Care Policy & Financing, or "HCPF."  Through HCPF, the State has created a Medicaid State Plan and a Medicaid waiver called the "Elderly Blind and Disabled" waiver (the "EBD Waiver").  The Medicaid State Plan and the EBD Waiver cover the Medicaid-funded services relevant to this matter.

---

[1] The federal agency that oversees state Medicaid programs is the Centers for Medicare & Medicaid Services, or "CMS."  The term "waiver" refers to CMS "waiving" certain program requirements to services a State offers through its Medicaid State Plan.  CMS waives the requirements that State Plan services be provided to beneficiaries across the entire state and that these services be comparable among all individuals within certain groups, and income and resource restrictions to allow states to target services to groups of people at serious risk of institutionalization.  MEDICAID.GOV, Home and Community Based Services, 1915(c), https://www.medicaid.gov/medicaid/hcbs/authorities/1915-c/index.html.

35.    HCPF delegates certain critical functions, like Medicaid eligibility assessments, to political subdivisions of the State, like county departments of human services.

36.    When a Coloradan with physical disabilities lives in a nursing facility (and is thus an "Institutionalized Individual"), the provider who coordinates and delivers the individual's LTSS is the nursing facility, to which Medicaid (through HCPF) pays a daily rate.  This daily rate accounts for the cost of providing LTSS, including nursing and personal care assistance; capital costs, including fair rental value of the building; and administrative and overhead costs, including food and laundry service, property taxes, property insurance, mortgage interest, and building repairs and improvements.

37.    For At-Risk Individuals, who live in the community, LTSS are coordinated either by the individuals themselves (an arrangement known as "self-direction"), or by case management agencies, known as Single Entry Points, or "SEPs," that contract with HCPF.  The case manager is responsible for arranging for the services the individual needs.  Community-based providers then bill Medicaid (through HCPF) for each unit of service provided to the individual.

38.    At-Risk Individuals and Institutionalized Individuals can receive a variety of transition coordination and housing services to help them move to, or remain in, the community.

39.    HCPF administers transition coordination services through Medicaid.  Transition coordination services include assessment, pre-transition planning, and coordination of the services needed to live in the community.

40.    HCPF administers some housing services through Medicaid.  For example, HCPF oversees "housing navigation services."  These are Medicaid services, provided by a housing

navigator, that help individuals find community-based rental housing and connect them to rental subsidies.

41.　　HCPF also oversees "home modifications," another Medicaid service.  Home modifications are alterations that are made to homes to make them more accessible, *e.g.* by installing wheelchair ramps or roll-in showers.  HCPF partners with another State agency, the Division of Housing ("DOH") within the Department of Local Affairs ("DOLA") to administer the home modifications benefit.

42.　　DOH provides tenancy support services to help individuals navigate the responsibilities of tenancy.  For example, these services include help maintaining and submitting eligibility documentation for housing services, communicating with neighbors and landlords, and complying with lease terms.

43.　　Rental assistance is provided through a combination of federal and State funds.  HCPF and DOH partner to offer rental assistance and supportive services to individuals moving out of institutions like nursing facilities.

44.　　DOH and the Colorado Housing and Finance Authority ("CHFA") fund affordable housing development in Colorado.  DOH makes grants and loans to private housing developers and local governments for affordable housing development.  CHFA administers federal and State tax credits through the Low-Income Housing Tax Credit (LIHTC) program, the largest source of affordable housing development in the country.  Through the LIHTC program, the State incentivizes private housing developers to create affordable rental housing opportunities for Coloradans, in alignment with public policy goals.

45.    The State fails to maintain a sufficient capacity of community-based service providers, including those providers responsible for creating and connecting individuals to housing opportunities.

46.    Institutionalized and At-Risk Individuals often experience significant difficulty accessing needed services like home health services, personal care, homemaker services, and housing-related services, because the State has not made these services sufficiently available.

47.    Individuals need these services to manage their health conditions, conduct activities of daily living, and live stably in the community.

48.    The State's failure to maintain a sufficient network of community-based LTSS providers prevents Institutionalized Individuals from returning to their communities, and leads many At-Risk Individuals to enter nursing facilities unnecessarily.

49.    Insufficient access to community-based care is especially acute for individuals who need overnight care or assistance several times throughout the day, and for individuals in rural and frontier communities.

50.    Colorado uses a starkly different reimbursement methodology for nursing facilities as compared to community-based service providers.  Nursing facilities receive an automatic annual rate adjustment, but community-based service providers do not.

51.    The State's disparate reimbursement methodologies result in reimbursement rates for community-based services that are inadequate to develop a sufficiently robust provider network.

52.    As HCPF stated in a recent funding request, "Personal care and homemaker attendants play a vital role in keeping Colorado's elders, aging parents and grandparents, and people with disabilities in their homes and communities.  If there are not enough people in Colorado who are

willing to perform these tasks, individuals cannot stay in their homes; the alternative care

settings are more expensive, such as placement in nursing facilities or assisted living facilities."

53.     The State also fails to ensure that the provider agencies with which it contracts develop

and implement reliable contingency plans when staff members miss shifts.  The resulting

unreliability of services places individuals at serious risk of unnecessary nursing facility

admission.  This unreliability also places family caregivers—many of whom are older adults or

people with disabilities themselves—under the physical and financial strain of filling regular

gaps in care for their loved ones, exacerbating the risk of unnecessary nursing facility

admissions.

54.     Colorado also limits its housing navigation service, which is intended to connect eligible

Institutionalized Individuals to community-based housing.  As a result, many Institutionalized

Individuals experience prolonged unnecessary segregation while struggling to identify

appropriate community-based housing opportunities.  The State does not offer the service at all

to At-Risk Individuals with housing needs.  Many At-Risk Individuals who are experiencing

homelessness or have unstable housing thus find themselves with little choice but to move into a

nursing facility.

55.      The State also limits its home modification service.  It offers a home modification

service through its waiver programs, but only reimburses home modifications for individuals

already living in the community, making the benefit effectively unavailable to Institutionalized

Individuals seeking to move to the community.

56.     The low lifetime cap on Colorado's home modification service also discourages some

individuals with significant mobility impairments from taking advantage of the service because

the benefit may not be enough to pay for all necessary home modifications.  Although DOH

offers tenancy support services to individuals who need help managing the responsibilities of

tenancy, the State does not make the service widely available to Institutionalized and At-Risk

Individuals.  The absence of this service can place at serious risk of unnecessary segregation

those whose disabilities, including a history of long-term institutionalization, may interfere with

lease compliance.

57.    The State also fails to adequately inform Institutionalized and At-Risk Individuals about

community-based alternatives to institutionalization.

58.    A Colorado regulation requires information about community-based alternatives to be

provided to all individuals considering entering a nursing facility.  See 10 Colo. Code Regs.

§ 2505–10:8.402.11.

59.    Information about community-based alternatives is frequently not provided to individuals

considering entering a nursing facility.  This lack of information leads many At-Risk Individuals

to become unnecessarily institutionalized, in violation of Title II of the ADA.

60.    Once individuals are admitted to a nursing facility (and thus become Institutionalized

Individuals), the State identifies individuals who want information about transitioning back to

the community by relying on data generated from a portion of a federally required standardized

survey (called the "Minimum Data Set" or "MDS").

61.    Section Q of the MDS asks surveyed residents whether they want "to talk to someone

about the possibility of leaving this facility and returning to live and receive services in the

community."

62.    Because community-based services often are not presented, many individuals enter or remain in nursing facilities without knowing options about where they could live and what services would be available in the community to support them.

63.    As a result, the State fails to determine their preferences, and many who would like to receive information about community living are incorrectly recorded as lacking interest in community living.  These individuals then commonly receive no information about community-based alternatives.

64.    It is the State's policy that nursing facility residents who are properly recorded as wanting information about community living should be referred to the State's "options counseling" program to receive information about community living opportunities.

65.    Most nursing facility residents recorded as interested in learning about community living are not referred for options counseling, do not receive the information they need, and are not provided with services to help them to return to the community.

66.    When Institutionalized Individuals do manage to get connected to a State-contracted Transition Coordination Agency, transitions often take several months to a year.  Some take even longer.

67.    Individuals routinely experience long delays while awaiting financial eligibility determinations the State requires for Medicaid-funded waiver services.

68.    Many of these financial eligibility determinations are unnecessary.

69.    As a 2016 State document indicates, the State has known for years that "many individuals that are already enrolled in Medicaid and . . . transitioning from long-term care facilities to community-based services are required to go through a new financial eligibility determination

even though it is not necessary.  In many cases, when an individual is already enrolled in Medicaid and meets the functional eligibility and targeting criteria for an LTSS program, a simple administrative change in the financial eligibility system is all that is necessary to reflect the current program status."

70.     Delays also result from extended times for processing requests for certain community-based services that must be in place for transition to occur.  These services include skilled home health services and durable medical equipment.

71.     The significant delays associated with these lengthy processing times by the State's delegated entities cause prolonged unnecessary segregation for Institutionalized Individuals. They also jeopardize individuals' housing opportunities and create additional obstacles and complications to completing transition.

72.     The longer individuals are institutionalized, the weaker their support networks and self-confidence become.  These frustrations lead some individuals to give up and withdraw from the process of transitioning to the community, remaining in nursing facilities even though they prefer to receive services in the community.

### THOUSANDS OF ADULTS WITH PHYSICAL DISABILITIES RESIDE IN SEGREGATED NURSING FACILITIES IN COLORADO, WHILE NUMEROUS OTHERS ARE AT RISK OF SEGREGATION.

73.     Approximately 9,000 Institutionalized Individuals live in Colorado nursing facilities.

74.     Nursing facilities are segregated service settings.  They usually have several centrally located nurses' stations and medication carts in the hallways outside of residents' rooms. Residents' lives tend to be subject to schedules and routines dictated by the needs of their institutions, leaving residents with little to no control over their daily activities.  Residents

15

typically live in shared rooms with little privacy or choice of roommate and spend their days in bed or sitting in a common area.

75.    Staff determine when and what residents eat, and, frequently, when they get in and out of bed, bathe, dress, and take care of personal hygiene and toileting needs.  Residents rarely leave nursing facilities to attend social, recreational, vocational, or religious activities of their choosing outside of the facility.  Many residents do not leave the facility at all except for medical appointments.  Nursing facility residents have limited to no interaction with individuals without disabilities other than facility staff.

76.    Many other Coloradans with physical disabilities are at serious risk of having to move to nursing facilities to access the services they need.  State policies and practices make it harder for individuals to access these services in the community than in nursing facilities, especially when there are time-sensitive needs.  Changes in personal circumstances, like an injury or deteriorating condition, the loss of a family caregiver, a financial setback, or loss of housing, can create a need for additional community-based services that goes unmet, driving unnecessary institutionalization.

### MANY INSTITUTIONALIZED AND AT-RISK INDIVIDUALS ARE QUALIFIED TO RECEIVE SERVICES IN MORE INTEGRATED SETTINGS AND WOULD NOT OPPOSE PLACEMENT IN SUCH SETTINGS.

77.    Institutionalized Individuals are Medicaid-eligible adult nursing facility residents with physical disabilities.  A physical disability is a physical impairment that substantially limits one or more major life activities, as defined in 28 C.F.R. § 35.108.

78.    At-Risk Individuals are Medicaid-eligible adults with physical disabilities, as defined in 28 C.F.R. § 35.108, who need LTSS to avoid unnecessary nursing facility admission, and for

whom a State-contracted entity charged with long-term care service planning or information-sharing for older adults and people with disabilities has been contacted about nursing facility services.

79.    If they were provided with access to LTSS in the community, many Institutionalized Individuals could and would live in integrated, community-based settings, and At-Risk Individuals could be relieved of the risk of unnecessary placement in nursing facilities.

80.    Institutionalized and At-Risk Individuals are qualified to receive community-based services.

81.    Community-based services are appropriate for the vast majority of Institutionalized Individuals.  An estimated 13 percent of Coloradans residing in nursing facilities have low care needs, meaning they often require only a few hours of personal care services a day or each week to help with medication management, grooming, housekeeping, shopping, and meal preparation. And community-based services are also appropriate to meet the needs of individuals who need more intensive services to help toilet, transfer, bathe, eat, or breathe.

82.    The State has shown that it is possible to serve adults with physical disabilities in the community.  For example, the State serves the majority of Coloradans with intellectual and developmental disabilities in the community, including those with complex needs.  Further, most former nursing facility residents who moved to the community live there successfully, and there is no reason to believe that the care needs of these former residents are atypical.

83.    Community-based services are also appropriate for virtually all At-Risk Individuals, who already live in the community.

84.     Many Institutionalized Individuals, if presented with individualized, realistic alternatives to nursing facility placement, would be interested in receiving services in community-based settings.

85.     The State's Strategic Action Planning Group on Aging has found "a clear desire by older Coloradans for improved capacity to stay in their homes with the use of assistive services and technologies and in-home modifications."  And a 2017 State survey revealed that 92 percent of former nursing facility residents living in the community for 24 months liked where they lived, compared with only 35 percent of individuals residing in facilities.

86.     Essentially all At-Risk Individuals, who already live in the community, would choose to continue receiving services in the community if the State improves access to those services.

### PROVIDING SERVICES IN INTEGRATED SETTINGS CAN BE ACCOMMODATED THROUGH REASONABLE MODIFICATIONS OF THE STATE'S EXISTING SERVICES.

87.     Colorado can implement reasonable modifications that would enable many of its current nursing facility residents to transition to, and live successfully in, the community, and prevent the serious risk of institutionalization for numerous other Coloradans with physical disabilities.

88.     Serving Institutionalized and At-Risk Individuals in the community is a cost-effective alternative to institutionalization.

89.     According to a 2023 State report, the average annual cost of community-based care for individuals on the Elderly, Blind, and Disabled waiver is $30,401, while the cost of nursing facility care averages $84,197 per year.

90.     Colorado has acknowledged in budget documents that nursing facility care costs more than community integration, with "savings [] compound[ing] over time as more people are able to transition into community living."

91.     The State could expand its capacity of community-based services to ensure their

adequacy.  For example, the State could take steps to expand the direct care workforce, including

in rural and frontier areas, and ensure effective contingency planning for when individual direct

care workers are unable to staff a shift as planned.  The State could also incentivize the

production of affordable, accessible community-based housing available for Institutionalized and

At-Risk Individuals, and expand housing navigation, home modification, and tenancy support

services to connect Institutionalized and At-Risk Individuals to available units and help them

maintain tenancy.

92.     The State could also ensure that Institutionalized and At-Risk Individuals are fully

informed of their options in choosing between community-based services and nursing facility

services.

93.     The State can also ensure that all Institutionalized Individuals who do not oppose

community placement, and for whom such placement is appropriate, promptly transition to

community-based long-term care—for example, by streamlining eligibility determinations and

processing times.

### VIOLATION OF TITLE II OF THE ADA, 42 U.S.C. §§ 12131–34

94.     The allegations of Paragraphs 1 through 93 of this Complaint are hereby realleged and

incorporated by reference.

95.     Defendant, the State of Colorado, is a public entity subject to Title II of the ADA, 42

U.S.C. § 12131(1).

96.     The Institutionalized and At-Risk Individuals are persons with disabilities covered by Title II of the ADA, and they are qualified to participate in the State's services, programs, and activities, including home and community-based services.  42 U.S.C. §§ 12102, 12131(2).

97.     Community-based services are appropriate for the Institutionalized and At-Risk Individuals, many of whom do not oppose community integration.

98.     The State violates the ADA by administering its service system for individuals with physical disabilities in a manner that fails to ensure the Institutionalized and At-Risk Individuals receive services in the most integrated setting appropriate to their needs.  42 U.S.C. § 12132.

99.     The State's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation at 28 C.F.R. Part 35.

100.    Providing services to the Institutionalized and At-Risk Individuals in the most integrated setting appropriate to their needs can be accomplished without fundamentally altering the State's system of providing LTSS to Institutionalized and At-Risk Individuals.

101.    All conditions precedent to the filing of this Complaint have been satisfied.  Fed. R. Civ. P. 9(c); 28 C.F.R. Part 35, Subpart F.

## REQUEST FOR RELIEF

The United States of America respectfully requests that the Court:

(A)     Grant judgment in favor of the United States on its Complaint and declare that the State of Colorado has violated Title II of the ADA, 42 U.S.C. §§ 12131–34, by failing to administer its services, programs, and activities for the Institutionalized and At-Risk Individuals in the most integrated setting appropriate to their needs.

(B)     Enjoin the State of Colorado to:

    1.     cease discriminating against the Institutionalized and At-Risk Individuals, and instead provide them appropriate, integrated community-based services consistent with their individual needs;

    2.     take steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate the effects of Defendant's unlawful conduct.

(C)     Order other appropriate relief as the interests of justice may require.

**Dated:** September 29, 2023

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General

REBECCA B. BOND
Chief

JENNIFER K. MCDANNELL
Deputy Chief

*/s/ Julia M. Graff*
JULIA M. GRAFF
H. JUSTIN PARK
JENNIFER ROBINS
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 353-5758
Facsimile: (202) 307-1197
julia.graff@usdoj.gov

*Counsel for Plaintiff United States of America*