Docusign Envelope ID: E064C111-FD86-4662-87B3-E15A735B2463

# SETTLEMENT AGREEMENT

## I.    INTRODUCTION

A.    In November 2019, the United States Department of Justice (the "United States") initiated an investigation under Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq.,* and its implementing regulations, into the adequacy of the State of Colorado's (the "State") services for adults with physical disabilities who wish to transition to, or remain in, the community.

B.    On March 3, 2022, the United States issued a Letter of Findings stating that Colorado does not comply with the integration mandate of Title II of the ADA (the "Letter of Findings").

C.    After the Parties did not reach a resolution of those findings, the United States filed suit against the State on September 29, 2023 in the United States District Court for the District of Colorado (the "Court"), captioned *United States of America v. The State of Colorado*, Civil Action No. 23-cv-2538 (the "Case").

D.    This Settlement Agreement (the "Agreement") now resolves the United States' Letter of Findings and the Case.

E.    The State does not concede the accuracy of any of the statements in the Letter of Findings, the Case, or the conclusion that it has violated Title II of the ADA as interpreted by the United States Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999). This Agreement does not serve as an admission by the State that corrective measures are necessary to meet the requirements of the ADA or the *Olmstead* decision, or that the State is not currently complying with the ADA. The State enters into this Agreement on its own accord and in the best interest of the State, to preserve judicial economy and state resources, and to best serve individuals with disabilities who are Medicaid members or Medicaid eligible.

F.    The State has cooperated fully with the investigation and has worked collaboratively with the United States to resolve the identified concerns, even though the State disputes many of the findings and conclusions. The Parties agree that it is in their mutual interest to avoid further litigation.

G.    The United States acknowledges that the State has begun implementing certain provisions of this Agreement before the Effective Date.

## II.    GOVERNING PRINCIPLES

A.    Individuals with disabilities should have control over where and how they live. They should have the opportunity to live in and engage with the community.

B.    Individuals with disabilities should also have the opportunity to make an Educated Choice of service setting.

*U.S. v. Colorado*, No. 1:23-cv-2538 (D. Colo.)
Settlement Agreement

Page 1 of 32

C.     Individuals with disabilities should receive the services described in this Agreement in an individualized, Person-Centered manner consistent with each individual's preferences, goals, needs, and abilities, as well as Educated Choice.

D.     The intended outcomes of this Agreement include increased self-determination, independence, and community integration for the Target Population members, by delivering community-based services, considering the needs of other individuals with disabilities. To achieve this goal, the State will develop and implement effective measures to prevent unnecessary admissions to nursing facilities and to transition nursing facility residents to the community when appropriate and unopposed.

E.     Individuals with disabilities should have access to sufficient affordable, accessible housing and reliable community-based services.

F.     Individuals with disabilities who reside in institutional settings should be afforded opportunities to engage in community activities to ensure an Educated Choice in where they choose to live and receive services.

## III.    TARGET POPULATION

A.     For the purposes of this Agreement, the Target Population consists of individuals with a physical disability over the age of 21 who are either enrolled in Medicaid or presumptively eligible for Medicaid and have a persistent condition likely requiring the use of State-administered long-term services and supports to live in the Community. The Target Population consists of the following two sub-populations:

   1.     The "At-Risk Population." Medicaid members or presumptively eligible Medicaid members who live outside of a nursing facility (including those who have been in a nursing facility for 30 days or less) and (a) have received a Level of Care Screening to access Medicaid nursing facility services; or (b) may need nursing facility services as identified by the Case Manager or Care Coordinator; or (c) are otherwise at risk for institutionalization as the State has determined through the methodology described in Section VII(A).

   2.     The "Institutionalized Population." Medicaid members or presumptively eligible Medicaid members living in a nursing facility for more than 30 days who are receiving Medicaid-funded nursing facility services.

B.     An Institutionalized Population member who completes Community Transition as described in Section VI will continue to be regarded as a member of the Target Population for the purposes of this Agreement.

C.     The presence of a co-occurring disability (such as mental illness or an intellectual or developmental disability) does not exclude an individual with a physical disability from the Target Population.

D.     An individual is not excluded from the Target Population by virtue of having or lacking Unpaid Supports.

## IV.    DEFINITIONS

This Agreement references the following capitalized defined terms throughout:

**Care Coordinator:** A Care Coordinator is an individual contracted or employed with a Regional Accountable Entity, tasked with coordinating the delivery of health care and behavioral health support services for certain Target Population members. A Care Coordinator is distinct from, and not considered, a Case Manager.

**Case Manager:** A Case Manager coordinates certain Community-Based Services for Target Population members. Case Managers have specialized knowledge and training to (1) arrange certain Community-Based Services and (2) facilitate Person-Centered planning for Target Population members. A Case Manager liaises and coordinates with Providers and (as appropriate) Unpaid Supports to help the Target Population member complete a Person-Centered service plan that enables that member to receive certain services, and to transition to or remain safely in the Community.

**Case Management Agency:** A Case Management Agency is a public or private agency that is contracted by HCPF to provide case management services to Target Population members for specific Community-Based Services.

**Community:** Community refers to integrated settings in which people live, work, recreate, and receive services. A Target Population member's Community residence will be the most integrated setting that is appropriate to the member's needs and that the member does not oppose. This will usually be a non-disability-targeted residence owned or rented by the member or the member's Unpaid Support(s). Community residences do not include nursing facilities or assisted living facilities.

**Community-Based Services:** Community-Based Services are individualized, Person-Centered, flexible, and culturally and linguistically competent services, delivered in integrated settings, to help Target Population members live in the Community. These services include those services and supports provided through a waiver authorized in Section 1915(c) or 1915(k) of the Social Security Act, 42 U.S.C. §§ 1396n(c), 1396n(k), and other services and supports such as long term home health, private duty nursing, program of all-inclusive care for the elderly, Housing Services, care coordination services for Target Population members, and case management described in this Agreement, including Transition Coordination Services.

**Community Transition:** Community Transition occurs when an Institutionalized Population member transitions from a nursing facility and into the Community.

**Diversion:** Diversion is the Person-Centered process that occurs to enable an At-Risk Population member who requires Community-Based Services to receive the services described in the Diversion Plan in the Community rather than a nursing facility.

**Diversion Planning:** Diversion Planning is the Person-Centered process through which the State provides and arranges services to enable an At-Risk Population member to avoid admission to a nursing facility and live instead in the Community.

**Educated Choice:** Educated Choice refers to a Target Population member's choice of service setting, based on full and accurate information about community-based alternatives to nursing facility care, including non-disability-specific settings. Educated Choice requires reasonable, documented efforts to identify and address any concerns or objections to community living raised by the Target Population member or by any Unpaid Support.

**Health Care Policy & Financing ("HCPF"):** The Colorado Department of Health Care Policy & Financing is the State agency that administers Colorado's Medicaid program. HCPF is the lead agency for the State's implementation of this Agreement.

**Home Maintenance Allowance:** The Home Maintenance Allowance is the amount a Target Population member can reserve for maintenance of the member's home in accordance with the requirements set forth in HCPF regulation at 10 Code Colo. Regs. § 2505-10:8.100.7.V.3.g.ii.

**Home Modifications:** Home Modifications are physical adaptations to a Target Population member's current or prospective private residence, which are necessary for that member's health, welfare, and safety or to enable the member to function with greater independence in the home or avoid nursing facility placement. A private residence may be an owner-occupied home or a rental unit.

**Housing Navigation Services:** Housing Navigation Services are services that help Target Population members obtain stable housing in the Community.

**Housing Services:** Housing Services are Housing Navigation Services, Home Modifications, housing voucher administration, the Home Maintenance Allowance program, and tenancy supports, as set forth in this Agreement.

**In-Reach:** In-Reach is the act of actively seeking to engage an Institutionalized Population member, and providing the Institutionalized Population member with: (1) full and accurate information about Housing Services and other Community-Based Services, as an alternative to nursing facility-based services; (2) responses to any questions or concerns raised by the member or the member's Unpaid Support(s); and (3) referrals to Case Management Agencies, Transition Coordination Agencies, or other agencies, as identified by the State, that help members meet their needs in the Community. The goal of In-Reach is to actively support Institutionalized Population members in making an Educated Choice about transitioning to the Community.

**In-Reach Counselor:** An In-Reach Counselor is a person not affiliated with, employed, or enriched by any nursing facility, who conducts group and/or individual In-Reach.

**Level of Care Screening:** A Level of Care Screening is the comprehensive evaluation of a Target Population member to determine the member's functional eligibility for admission or continued stay in certain long-term services and supports programs.

**Monitor**: The Monitor is the individual defined in Section X of this Agreement.

**Parties:** The Parties are the United States and the State.

**Person-Centered:** Person-Centered refers to the Person-Centered principles as set forth in the planning process described in 42 C.F.R. § 441.301(c)(1).

**Planned Transition Date:** Planned Transition Date is the date of an Institutionalized Population member's Community Transition identified in a member's Transition Plan and any subsequent amendment or extension of that date as agreed to by the member.

**Provider**: A Provider is an individual or entity who professionally provides Community-Based Services, Housing Services, or any Medicaid reimbursable services that support Community Transition to one or more members of the Target Population.

**Rapid Referral:** Rapid Referral is the Person-Centered process that occurs when an At-Risk Population member, who is admitted to a nursing facility, does not oppose living in the Community, and is experiencing Unstable Housing, is rapidly referred to a Transition Coordinator to receive Transition Coordination Services.

**Rapid Reintegration:** Rapid Reintegration is the Person-Centered process that occurs when an At-Risk Population member, who is admitted to a nursing facility, does not oppose living in the Community, and is not experiencing Unstable Housing is transitioned in 30 days or less from a nursing facility to the Community and receives services as described in the member's Rapid Reintegration Plan.

**Rapid Reintegration Plan:** Rapid Reintegration Plan is a written Person-Centered plan developed for the purpose of rapidly transitioning an At-Risk Population member from a nursing facility safely into the Community.

**Transition Coordination Agency**: A Transition Coordination Agency is an agency that provides Transition Coordination Services to Target Population members.

**Transition Coordination Services**: Transition Coordination Services are a targeted case management service, consistent with the terms of Sections VI and VII. Transition Coordination Services help Target Population members transition into or remain in the Community. Transition Coordination Services include coordinating with nursing facility staff, Unpaid Supports, and Providers; facilitating Transition Planning; and arranging Housing Services and other Community-Based Services as needed. For purposes of this Agreement, Target Population members need Transition Coordination Services if they: (1) have Unstable Housing, (2) meet an institutional level of care at the time of Community Transition or Diversion, (3) could not successfully complete Community Transition without Transition Coordination Services to resolve documented medical, logistical, or service needs (i.e., a lack of Unpaid Supports, difficulty supporting a member's instrumental activities of daily living in the Community, or challenges arranging skilled nursing care, durable medical equipment, and/or behavioral health services before Community Transition), or (4) could not successfully complete Community Transition without Transition Coordination Services to resolve psychological and emotional effects of institutionalization that pose a documented barrier to Community Transition.

**Transition Coordinator:** A Transition Coordinator provides Transition Coordination Services to Target Population members who want to move to the Community. Transition Coordinators have specialized knowledge and training in arranging identified Community Based-Services for

members transitioning from nursing facilities. Transition Coordinators may not be affiliated with any nursing facility.

**Transition Planning:** Transition Planning is the Person-Centered process of transitioning an Institutionalized Population member into the Community. Transition Planning must comply with Section VI and begins on the Transition Start Date and is completed once the Institutionalized Population member is safely housed in the Community.

**Transition Plan:** A Transition Plan is an Institutionalized Population member's Person-Centered plan as described in Section VI to effectuate the member's Community Transition.

**Transition Start Date:** A Transition Start Date is the day a Transition Coordinator accepts the referral to support the Institutionalized Population member's Community Transition.

**Unpaid Support:** An Unpaid Support is a person who: (1) is not employed by a Provider; (2) knows a Target Population member personally; and (3) regularly, voluntarily, and with the Target Population member's consent, helps the Target Population member access services, perform activities of daily living, obtain and maintain housing, and otherwise engage in the Community.

**Unstable Housing:** Target Population members have Unstable Housing when they would benefit from assistance with accessing adequate and/or safe housing because they may, for example: (1) move frequently for financial reasons, e.g. two or more times during the last 60 days; (2) pay more than 30 percent of their income for housing, and have difficulty paying for necessities like food, clothing, transportation, and medical care; (3) live in another person's home because of economic hardship; (4) be threatened with eviction or have been otherwise notified that their right to occupy their current housing or living situation will be terminated within 21 days; (5) live in a hotel or motel; (6) live in severely overcrowded housing, such as a single-room occupancy or efficiency apartment unit where more than two people reside or live in a larger housing unit where more than 1.5 people reside per room; (7) be experiencing homelessness, including residing in a homeless shelter or transitional housing; or (8) live in housing that has characteristics associated with instability and an increased risk of homelessness, e.g. substandard housing, a home where emotional or physical abuse, threat of violence, exploitation, neglect, illegal drug use or other illegal activities commonly occur, or any other location detrimental to the member's health and safety.

## V.    IN-REACH COUNSELING AND PUBLIC OUTREACH

A.    <u>Nursing Facility In-Reach.</u> The State will ensure that In-Reach counseling is provided to Institutionalized Population members to provide them the opportunity to make an Educated Choice of service setting.

    1.    <u>Group In-Reach.</u> The State will begin providing, at least once every six months, group-based In-Reach counseling at every nursing facility where Institutionalized Population members reside in accordance with the following:

        a.    By January 31, 2025, the State will have provided Group In-Reach at least once to 75 percent of nursing facilities where Institutionalized Population members reside.

     b.     The In-Reach Counselor providing Group In-Reach will record members' requests for Individual In-Reach and refer them for Individual In-Reach. The In-Reach Counselor will refer members who express a desire to transition directly to a Transition Coordination Agency, or other agency, for further assessment and to support the transition. Referrals will take place within six business days.

     c.     By April 30, 2025, the State will have provided Group In-Reach at least once at every nursing facility where Institutionalized Population members reside.

2.    <u>Individual In-Reach.</u> By February 28, 2026, the State will begin providing Individual In-Reach counseling to each Institutionalized Population member, as follows:

     a.     Individual In-Reach occurs when an In-Reach Counselor provides In-Reach during a meeting with one Institutionalized Population member and their legal guardian, if applicable. If the member has Unpaid Supports and wants them to attend a meeting, then they will be encouraged to attend. An Individual In-Reach meeting will occur in person except for health or safety reasons or if the Institutionalized Population member wishes to meet virtually.

     b.     The State will provide Individualized In-Reach to Institutionalized Population members in a manner and frequency sufficient to provide them with an Educated Choice of service setting. In-Reach Counselors will have sufficient contact with members to respond to a member's, legal guardian's, or Unpaid Support's questions or concerns about Community Transition.

     c.     When a member requests Individual In-Reach at a Group In-Reach event, the Individual In-Reach meeting will take place within 10 business days of the referral for Individual In-Reach.

     d.     In-Reach Counselors will individualize their efforts to engage members based on their understanding of the member's concerns, preferences, and needs.

     e.     At a minimum, In-Reach Counselors will document the member's name, date of meeting, and the member's level of interest in Community Transition. Upon learning that a member is interested in Community Transition, the In-Reach Counselor will refer the member, within six business days, to a Transition Coordination Agency, or other agency, for further assessment and to support the transition unless the member already has a Transition Coordinator or has recently engaged in the Community Transition process. The In-Reach Counselor must do so without assessing the feasibility of transition.

     f.     Institutionalized Population members will not be required to speak with In-Reach Counselors, but will have regular opportunities to do so.

     g.     By December 31, 2026, all Institutionalized Population members will have received, or have opted out of, Individual In-Reach at least once. If an Institutionalized Population member declines In-Reach, the In-Reach Counselor

will (i) document the decision and why the member declined In-Reach, if provided and (ii) develop a plan to follow up in the future, if appropriate.

3.    <u>Nursing Facility Role in In-Reach.</u> The State will require nursing facilities to make private space available for In-Reach counseling, out of the presence of nursing facility staff, unless the member requests the presence of nursing facility staff. The State will prohibit nursing facilities from interfering with In-Reach and will respond to reports of interference with In-Reach activities.

B.    <u>Informational Materials.</u> By June 30, 2025, the State will publish on its website and make available accessible information for Target Population members, their guardians, if applicable, and their Unpaid Supports about how to obtain Community-Based Services, designed to support their Educated Choice of service setting. The State will update this information as needed and disseminate it to agencies and organizations that serve as referral sources for Community-Based Services, Target Population members, and Target Population members' Unpaid Supports. These materials will describe the various Community-Based Services available to Target Population members.

C.    <u>Outreach.</u> The State will develop and disseminate information about: (1) the services available to Target Population members under the Agreement; (2) the array of available Community-Based Services; and (3) how Target Population members can access these services.

D.    <u>Records.</u> The State will record and maintain the information related to its implementation of this Section, including:

1.    The date, location, and number of attendees for every Group In-Reach event;

2.    The number of Institutionalized Population members attending Group In-Reach who subsequently ask (i) to receive Individual In-Reach, or (ii) to be connected to a Transition Coordinator or other Provider supporting their transition;

3.    The number of Institutionalized Population members who received Individual In-Reach;

4.    The number of Institutionalized Population members receiving Individual In-Reach who subsequently ask to be connected to a Transition Coordinator or other Provider to support the transition; and

5.    The documentation described in Section V(A)(2)(g) for each Institutionalized Population Member who declines In-Reach.

## VI.    COMMUNITY TRANSITIONS

A.    <u>Assignment of Transition Coordinators.</u> When an Institutionalized Population member who has decided to transition to the Community is referred for Transition Coordination Services, the State will ensure, except in rare circumstances, that a Transition Coordinator accepts assignment to serve the Institutionalized Population member within five business days of that

referral. The Transition Coordinator will facilitate Transition Planning for an Institutionalized Population member who wants to transition to the Community.

B.    <u>Commencement of Transition Planning.</u> Transition Planning and the facilitating of Transition Coordination Services will begin on an Institutionalized Population member's Transition Start Date.

C.    <u>Transition Team.</u> For each Institutionalized Population member who wants to transition to the Community, the assigned Transition Coordinator will work with the member to form a transition team relevant to the member's Transition Planning. Within 10 business days of the Transition Start Date, the Transition Coordinator will have an initial meeting with the member and form the transition team. Transition team members will be available for consultation as needed. To the extent possible, the State will ensure that nursing facility staff work in concert with the transition team, providing records and information about the member's strengths, needs, preferences, and interests. The Transition Coordinator will serve as the lead contact with the member leading up to Community Transition. Transition teams will include without limitation the following, as appropriate:

    1.    Individuals knowledgeable about Housing Services and other Community-Based Services that the member may require to transition;

    2.    Individuals with the linguistic and cultural competence to serve the member;

    3.    A Peer Mentor (if available); and

    4.    With the member's consent, other individuals, including the member's Unpaid Support(s).

D.    <u>Transition Plans.</u> Transition Plans will be Person-Centered, drafted within 52 days of the Transition Start Date, and updated consistent with the member's transition progress and needs. Transition Plans will document the Planned Transition Date and specify all needed services; the member's nursing facility; any barriers to transition; and the steps the transition team will take to avoid or overcome those barriers. The Planned Transition Date will not be unreasonably delayed. A Community Transition will be considered feasible except where a member's needs cannot be met in the Community, even with the services described in this Agreement. Determinations that a transition is not feasible should be rare.

E.    <u>Transition Escalation.</u> By April 30, 2026 and thereafter, Community Transition will occur by the Planned Transition Date, absent unavoidable circumstances. If the Community Transition is not completed within 120 days of the member's Transition Start Date, the State will refer the matter to the HCBS Escalation Team, which will review the matter, document why the Community Transition is taking longer, and, as appropriate, assist the Transition Coordination Agency and Transition Coordinator assigned to that member to expedite the Community Transition.

F.    Transition Totals.

1.    To calculate the total number of Community Transitions for purposes of this Section, a Community Transition means any Institutionalized Population member transitioned from a nursing facility into the Community, except Community Transitions do not include discharges: (a) from a nursing facility to a hospital, assisted living facility, or different nursing facility, (b) occurring within 30 days from admission to the nursing facility, or (c) where a member returns to a nursing facility (excluding brief or rehabilitative stays) caused in substantial part by insufficient provision of Community-Based Services.

2.    If an Institutionalized Population member, who is counted toward either required total in paragraphs (3) or (4) below, then returns to a nursing facility, then the State will report the event to the Monitor. The Monitor may require the State to provide documentation of facts supporting a conclusion that the member's departure from the Community was not caused in substantial part by insufficient provision of Community-Based Services. In their discretion, the Monitor may conduct interviews, review records, and verify whether the individual's prior transition can be counted toward the totals. The Parties will have an opportunity to review the facts and provide comment.

3.    Of Institutionalized Population members who need Transition Coordination Services and Community-Based Services to successfully transition to the Community, the State shall ensure that at least 950 receive Transition Coordination Services and successfully complete Community Transition within the term of the Agreement.

4.    Separate from paragraph (3), the State will ensure that at least 1,050 additional Institutionalized Population members complete Community Transition within the term of this Agreement while receiving Community-Based Services within six months after Community Transition. If the State exceeds the transition total in paragraph (3), it may count that excess toward its transition total in paragraph (4).

5.    In achieving these requirements, the State will prioritize Community Transitions for Institutionalized Population members whose nursing facility stays began before the Effective Date of this Agreement.

6.    The State may not count the same individual at once toward both its obligations in paragraphs (3)–(4) of this Subsection, and its obligations in Section VII(E).

7.    The State will achieve 35% of the transition totals in paragraphs (3)–(4) by the end of the second year of the Agreement's term. If the State is unable to do so, then the United States may utilize the dispute resolution procedures described in Section XIV(H)–(I).

8.    During the third year within the Agreement's term, the Monitor will begin conducting a study based on records, interviews, and other established methodology, to determine the number of Institutionalized Population members who: (a) can appropriately live in the Community if Community-Based Services are provided; (b) do not oppose living in the Community; (c) are not already receiving effective State transition supports

that are likely to result in the member's Community Transition within a reasonable time and are consistent with the member's specific needs; and (d) have lived in the nursing facility for more than 75 days. Before the Monitor begins the study, the Parties will have the opportunity to submit comments to the Monitor on the study's design and methodology. The Monitor will begin the study early enough in the third year of the Agreement's term to report the study's results to the Parties by August 31, 2027. If necessary, the Monitor may ask the Parties for a reasonable extension of the deadline for this report, to which the Parties will not unreasonably withhold consent. The Parties may, within 45 days of that report, provide the Monitor with written responses to the study.

If, after the Monitor reviews the Parties' written responses, the evidence indicates that fewer than 450 remaining Institutionalized Population members meet criteria (a)–(d), then the numerical requirements of paragraphs (3)–(4) above will at that point be waived. If the evidence indicates that more than 450 remaining Institutionalized Population members meet criteria (a)–(d), then the Parties will, with the assistance of the Monitor, negotiate any appropriate modifications to the Agreement that would best achieve the goals of the 450-person benchmark. These negotiations will include modifying the numerical requirements in paragraphs (3)–(4) so that fewer than 450 Institutionalized Population members meeting criteria (a)–(d) will remain in nursing facilities by the end of the fourth year of the Agreement's term. If the Parties are unable to reach a resolution on any such modifications, then the United States may, before the Agreement's scheduled termination date, seek a judicial remedy pursuant to Section XIV(I)(1)(e).

G.    <u>Essential Services.</u> All essential services the member's Transition Plan identifies as necessary to ensure basic health and safety must be arranged before Community Transition occurs.

H.    <u>Transition Data Analysis.</u> By October 31, 2025, the State will review and analyze the data collected pursuant to Section VI(L) to monitor transition times for Institutionalized Population members transitioning to the Community.

I.    <u>Documentation of Educated Choice.</u> Starting April 30, 2025, if an Institutionalized Population member decides not to complete Community Transition, the Transition Coordinator will document what information was provided to the member, the reason the member (and the member's Unpaid Supports or guardian, if relevant) gave for deciding not to complete Community Transition, and any information the Transition Coordinator provided in response. The Transition Coordinator will promptly transmit this documentation to the HCBS Escalation Team. On a monthly basis, the HCBS Escalation Team will review the documentation to assess whether the member was provided sufficient information and opportunities to make an Educated Choice. If the HCBS Escalation Team determines that the member (or the member's Unpaid Supports or guardian, if relevant) could benefit from additional information to address their concerns about transition, then the HCBS Escalation Team will work with Transition Coordination Agencies to continue the process of Educated Choice, including the resolution of transition barriers.

J.      Eligibility Determinations. To reduce transition times, by October 31, 2025, the State will take steps to simplify and streamline functional and financial eligibility determinations for Community-Based Services.

K.      Post-Transition Monitoring. To ensure that Institutionalized Population members who transition out of a nursing facility are adequately supported in the Community, the State will conduct post-transition monitoring as required by 10 Code Colo. Regs. § 2505-10:8.519.27.F.1.c–d (2024).

L.      Records. The State will record and maintain the information related to its implementation of this Section, including:

        1.      For any member referred to the HCBS Escalation Team, the member's name, a copy of that member's current Transition Plan, the reason the Community Transition did not occur within 120 days, and actions the HCBS Escalation Team took to address any transition barriers.

        2.      For each Institutionalized Population member who is referred to Transition Coordination: (a) the date when the member was referred to a Transition Coordinator; and (b) the date when the Transition Coordinator accepted the referral;

        3.      For each Institutionalized Population member who begins Transition Planning: (a) the member's name; (b) the Transition Start Date; (c) the facility where the member lived on the Transition Start Date; (d) whether the member had access to housing outside of a nursing facility as of the Transition Start Date, and if so, whether the housing needed Home Modifications as of the Transition Start Date; and (e) the date (if any) on which the member's Transition Plan was completed during Transition Planning;

        4.      For every member who completes Community Transition: (a) the date on which Community Transition occurred; (b) the date of service activation or first date of service; and (c) the address of the member's residence; and

        5.      For any Institutionalized Population member who decided not to complete Community Transition, the Educated Choice documentation required by Section VI(I).

**VII.   DIVERSION, RAPID REINTEGRATION, AND PLANNING FOR AT-RISK POPULATION MEMBERS**

A.      Identifying At-Risk Population Members. By June 30, 2025, the State will develop and implement a system that, after that point, timely and regularly identifies At-Risk Population members described in Section III(A)(1).

        1.      Within 30 days after the Effective Date or five business days of the State entering into a Contract with the Monitor, whichever is later, the State will submit to the Monitor and the United States a proposed methodology for establishing criteria to identify members at risk of institutionalization.

2. By January 31, 2025, the State will have completed stakeholder engagement, data collection, and analysis to determine factors that place a member at risk of nursing facility admission.

3. By February 28, 2025, the State will submit to the Monitor and the United States a report outlining the analysis used, proposed methods for identifying and updating the At-Risk Population, and approach by which the methods will be validated.

4. The Monitor and the United States will provide feedback within 30 days of receiving the methods and report identified in the preceding paragraph. The State will address this feedback within 30 days. Before implementing its methodology, the State must make any revisions necessary to obtain the Monitor's approval.

5. Within two months after the Monitor approves the methodology, the State will use the methodology to identify At-Risk Population members. Thereafter, those members identified through the methodology will be considered members of the At-Risk Population for purposes of this Agreement.

6. Within six months of implementing the methodology to identify At-Risk Population members, the State will ensure that at least 95% of At-Risk Population members are assigned a Case Manager or Care Coordinator and contacted by that Case Manager or Care Coordinator to discuss the topics identified in Section VII(B). The State will continue to maintain this 95% rate over the duration of the Agreement's term.

7. One year following the implementation, the State will validate the accuracy of the methodology and refine as necessary.

8. If the State changes the methodology, the State will submit to the Monitor and the United States a report outlining the analysis used, proposed changes to the methods for identifying and updating the At-Risk Population, and the approach by which the new methods will be validated. The Monitor and the United States will provide feedback within 30 days of receiving the submission. The State will address this feedback within 30 days of receipt. Before implementing its methodology, the State must make any revisions necessary to obtain the Monitor's approval.

B. <u>Contact with Newly Identified At-Risk Population Members.</u> After the six-month implementation period discussed in Section VII(A)(6), a Case Manager or Care Coordinator will contact newly identified At-Risk Population members within 10 business days of receiving a referral from the State. The Care Coordinator or Case Manager will discuss with the member, and, when requested by the member, any Unpaid Supports or guardian involved in decision-making about the member's care, the Community-Based Services, Housing Services, and other services needed to remain in the Community.

C. <u>Diversion.</u> For an At-Risk Population member who receives a Level of Care Screening; may need nursing facility services as identified by the Case Manager or Care Coordinator; or indicates that they are seeking nursing facility services, the State will take the following steps:

1.      The State will require the Case Manager to provide the member with all information necessary to make an Educated Choice of service setting. The State will also require the Case Manager to document all steps taken to ensure Educated Choice and all facts indicating whether the member opposes or does not oppose Community living.

2.      For an At-Risk Population member who does not oppose living in the Community and has not been admitted to a nursing facility, the State will require the Case Manager or Care Coordinator to immediately begin Diversion Planning and to do the following:

    a.      <u>Commence or Increase Services in the Community.</u> The Case Manager or Care Coordinator will refer to or arrange for the member appropriate and necessary Community-Based Services, as identified through Diversion Planning, to meet the member's service needs in the Community.

    b.      <u>Refer Members with Unstable Housing.</u> For an At-Risk Population member with Unstable Housing, the Case Manager or Care Coordinator will refer to or arrange appropriate Housing Services, as identified through Diversion Planning, to meet the member's needs in the Community.

D.      <u>Rapid Referral and Rapid Reintegration.</u> Starting April 30, 2026, for every At-Risk Population member who is admitted to a nursing facility and does not oppose living in the Community, the State will ensure that the member's Case Manager effectuates Rapid Reintegration or Rapid Referral. For members experiencing Unstable Housing, the State will Rapidly Refer those members to Transition Coordination Services, as described in Subsection (1) below. For those members that are not experiencing Unstable Housing, the State will effectuate Rapid Reintegration as described in Subsection (2) below.

1.      <u>Rapid Referral.</u> If an At-Risk Population member who does not oppose living in the Community is to be admitted to a nursing facility and is also experiencing Unstable Housing, the State will ensure that the member's Case Manager promptly refers the member to a Transition Coordinator to receive necessary Transition Coordination Services to return to the Community. This referral process will be known as a "Rapid Referral."

    a.      <u>Timing of Rapid Referral.</u> A Rapid Referral must occur within two business days of the Case Manager learning that an At-Risk Member is to be admitted to a nursing facility and the member does not oppose living in the Community.

    b.      <u>Preliminary Referral Documentation.</u> Before Rapidly Referring the member to a Transition Coordinator, the member's Case Manager will document and identify any barrier to transitioning the member back into the Community, the rationale for any contemplated nursing facility stay, and any other information the Case Manager determines necessary to help accelerate the Community Transition process once the member is Rapidly Referred.

    c.      <u>Accepting Referral.</u> Transition Coordinators must accept a Rapid Referral of a member within two business days of receiving the referral. If the Transition

Docusign Envelope ID: E064C111-FD86-4662-87B3-E15A735B2463

Coordinator is unable to accept the Rapid Referral, the Transition Coordinator must immediately notify HCPF, at which point HCPF will identify a different Transition Coordinator to accept the referral.

  d. <u>Rapid Transition Coordination Services.</u> Upon accepting a Rapid Referral, a Transition Coordinator will promptly begin the Community Transition process as set forth in Section VI of this Agreement.

2. <u>Rapid Reintegration.</u> If an At-Risk Population member who does not oppose living in the Community is to be admitted to a nursing facility and the member is not experiencing Unstable Housing, the member's Case Manager will immediately begin developing a Rapid Reintegration Plan to effectuate a Rapid Reintegration.

  a. <u>Timing of Rapid Reintegration Plan.</u> The State will ensure that the Case Manager develops a Rapid Reintegration Plan during the Level of Care Screening for nursing facility admission. The Rapid Reintegration Plan will be amended and updated as necessary.

  b. <u>Components of Rapid Reintegration Plan.</u> The Rapid Reintegration Plan will include the following, as appropriate:

    i. Any barriers to Rapid Reintegration, and the steps that will be taken to avoid or overcome those barriers;

    ii. The tasks that must occur before, during, and after Rapid Reintegration to ensure that Rapid Reintegration is successful, with timeframes for completing each task and responsibilities assigned to specific people;

    iii. The date on which Rapid Reintegration is intended to occur, and the intended duration of the contemplated nursing facility stay;

    iv. The rationale for any contemplated nursing facility stay and for the length of that contemplated stay; and

    v. Post-reintegration plan, for the Case Manager to follow up with the member.

  c. <u>Execution of Plan.</u> The member's Case Manager will initiate and monitor Rapid Reintegration efforts and will be responsible for communicating with others who are assigned tasks in the Rapid Reintegration Plan.

  d. <u>Escalation of Rapid Reintegration.</u> A Rapid Reintegration occurs within 30 days of nursing facility admission. If a Rapid Reintegration does not occur within that timeframe, the HCBS Escalation Team will review the matter, update the Rapid Reintegration Plan with a determination of why the transition is taking longer, and provide assistance to the Case Management Agency or Case Manager to expedite the reintegration.

3.      Rapid Referral and Rapid Reintegration Data Analysis. By April 30, 2026, the State will review and analyze the data collected pursuant to this Section to monitor reintegration times.

4.      Post-Reintegration Planning for Waiver Service Recipients. The State will ensure that At-Risk Population members who complete Rapid Reintegration and receive HCBS waiver services receive adequate case management to remain in the Community.

E.      Diversion Metrics.

1.      Upon implementation of the methodology described in Section VII(A), the State will use the methodology to identify the number of At-Risk population members as of twelve months before the date of implementation. The State will calculate the percentage of those identified At-Risk Population members who remained in the Community throughout that twelve-month baseline period.

2.      For purposes of this Section, there will be a first compliance period that will begin the day after the baseline period ends. This first compliance period will end on the first date that is both (a) at least 180 days after the first day of the first compliance period, and (b) exactly 90 days before an anniversary of the Effective Date. After the first compliance period ends, each subsequent full one-year period within the term of the Agreement will constitute a subsequent compliance period.

3.      For each compliance period described in paragraph (2), the State will calculate a percentage using the same methodology and formula described in paragraph (1). The percentage in the first compliance period shall improve on the percentage from the baseline period by (a) the number of percentage points required in the following table multiplied by (b) the number of days in the compliance period divided by 365. The percentage in each subsequent compliance period shall improve on the percentage from the immediately preceding compliance period by the number of percentage points required in the table.

| Percentage for baseline period or for preceding compliance period | Required improvement in subsequent compliance period |
| --- | --- |
| 86–100% | 0 percentage points |
| 76–85% | 2.5 percentage points |
| 66–75% | 5.0 percentage points |
| 56–65% | 7.5 percentage points |
| 0–55% | 10.0 percentage points |

4.      If the methodology in Section VII(A) changes pursuant to procedures described in Section VII(A)(8), then the most recent prior percentage described in paragraph (1) or (3) will be recalculated using the new methodology.

5.      If a Party believes that the required improvement percentage should be adjusted up or down, then the Party will provide all facts supporting that belief to the other Party

and to the Monitor, and the Parties with the Monitor's assistance will meet and confer about possible adjustment.

6.      For purposes of calculating any percentage in paragraph (1) or (3), an At-Risk Population member remains in the Community if the member lives in the Community at the end of the baseline period or compliance period and was not, within that period, admitted to a nursing facility for more than 75 days.

7.      No individual may be counted at once toward both (a) the State's obligations in paragraphs (1)–(6), and (b) the State's obligations in Section VI(F) (Transition Totals).

F.      <u>General Policies and Procedures.</u> The State will develop and implement the following general policies and procedures to facilitate Diversion and Rapid Reintegration.

1.      <u>Housing Retention During Rapid Reintegration Planning.</u> In order to increase utilization of the Home Maintenance Allowance program by At-Risk Population members to maintain housing during brief nursing facility stays, the State will take the following steps by June 30, 2025:

a.      The State will provide regular training to Case Managers, Transition Coordinators, nursing facility staff, and other relevant Providers to ensure these individuals are knowledgeable of the Home Maintenance Allowance program and its role in reintegrating At-Risk Population members to the Community.

b.      The State will ensure that the Case Manager responsible for developing the Rapid Reintegration Plan with the At-Risk Population member, assists in and facilitates, as appropriate, the submission of the necessary verifications to calculate the Home Maintenance Allowance and the transmittal of required documentation to the appropriate county staff.

c.      The State will make information about the scope of the Home Maintenance Allowance program publicly available, such as by publishing information on its website.

2.      <u>Transition Coordination Services.</u> By October 31, 2025, the State will provide Transition Coordination Services to At-Risk Population members.

3.      <u>Level of Care Screening.</u> By August 31, 2025, the State will standardize the Level of Care Screening process to create a consistent process across Case Management Agencies. This will include increasing information sharing across the case management system to ensure Educated Choice during the Level of Care Screening process.

G.      <u>Records.</u> The State will record and maintain the information related to its implementation of this Section, including:

1.      For each At-Risk Population member who begins Diversion Planning: (a) the member's name and contact information; (b) the date on which the member was identified as an At-Risk Population member; (c) if the member was hospitalized at the

start of Diversion Planning, the hospital's name, discharge date, and discharge location (status); (d) the date on which the Case Manager or Care Coordinator was assigned to the member; (e) the Case Manager's name and contact information; (f) the date of first contact by a Case Manager or Care Coordinator; and (g) which Community-Based Services the member was referred to receive.

2.      For each At-Risk Population member described in Section VII(C)(1) who opposes living in the Community or who begins Diversion Planning but later opposes living in the Community, all of the Case Manager's documentation of the member's Educated Choice, including the reasons for the member's decision and actions the Case Manager took to address any concerns about living in the Community.

3.      For each At-Risk Population member who does not oppose living in the Community but is admitted to a nursing facility: (a) the date of the admission; (b) the name and address of the nursing facility; and (c) the date on which the member's Rapid Reintegration Plan, if any, was completed.

4.      For each At-Risk Population member who receives a Rapid Referral, the date of the Rapid Referral and the Transition Coordination Agency that accepted the Referral.

5.      For each At-Risk Population member who completes Rapid Reintegration, the date of Rapid Reintegration, and the address to which the member moved upon Rapid Reintegration.

6.      For any At-Risk Population member who is not Rapidly Reintegrated and is referred to the HCBS Escalation Team, a copy of that member's Rapid Reintegration Plan.

7.      The average transition times for At-Risk Population members Rapidly Referred, the average reintegration times for At-Risk Population members Rapidly Reintegrated into the Community, the total number of Rapid Reintegrations and Rapid Referrals that resulted in a Community Transition, and the number of those At-Risk Population members that remained in the Community.

## VIII.  COMMUNITY-BASED SERVICES

A.      Community-Based Services. The State will administer Community-Based Services to enable Target Population members to successfully live in the Community, with sufficient flexibility to address fluctuations in a Target Population member's needs and the member's Community Provider availability.

B.      Peer Mentorship. To enable Institutionalized Population members to access peer mentorship services, by October 31, 2025 the State will develop and begin implementing a plan designed to promote access to peer mentorship, including by providing training to Case Managers, Transition Coordinators, and Care Coordinators, and enhancing recruitment efforts.

C.    <u>Presumptive Eligibility.</u>

    1.    With all deliberate speed, the State will submit to the Centers for Medicare & Medicaid Services ("CMS") an application to implement presumptive eligibility. The application will be finalized no later than February 28, 2025.

    2.    The State will consult with the Monitor, the United States, and stakeholders in developing and implementing presumptive eligibility. To the extent the Monitor or the United States has feedback on how the State is developing and implementing presumptive eligibility, the State will address such feedback.

    3.    In light of the Parties' agreement that presumptive eligibility is a necessary component of this Agreement, if the State has not implemented presumptive eligibility by October 31, 2026, then the State will promptly meet and confer with the Monitor and the United States about next steps for implementing presumptive eligibility in the State.

    4.    Notwithstanding Section III, individuals who are presumptively eligible for Medicaid are not part of the Target Population until presumptive eligibility has been implemented in the State.

D.    <u>Expansion of Self-Direction.</u> By February 28, 2027, the State will submit to CMS an application to amend the State's Medicaid State Plan under Section 1915(k) of the Medicaid Act so that Target Population members transitioning to or living in the Community can choose to self-direct their care.

E.    <u>Prior Authorization Requests.</u> By April 30, 2026, the State will simplify and streamline the approval process for prior authorization requests for long-term home health services and requests to exceed cost containment.

F.    <u>No Inconsistent Amendments.</u> The State will not change or amend its Medicaid State Plan or HCBS waiver programs in any way that would hinder its compliance with this Agreement, unless the State determines that an inconsistent amendment is necessary to comply with other federal law. In that event, the State will notify and consult with the Monitor and the United States as soon as the amendment is considered.

G.    <u>Caregiver Supports.</u> To enable Target Population members to live in the Community, by October 31, 2025, the State will support the members' Unpaid Supports, as well as their paid family caregivers, by promoting access to respite, consumer directed services, and training.

H.    <u>Transition Coordination Units.</u> By April 30, 2025, the State will have increased the total maximum number of reimbursable units available to Providers as needed to perform transition functions as set forth in this Agreement, including pre- and post-transition functions.

I.    <u>Housing Services.</u> The State will make best efforts to ensure sufficient statewide availability of Housing Services to enable Target Population members to make an Educated Choice of service setting.

1.    <u>Housing Vouchers.</u> By February 28, 2026, the State will submit to the Monitor and the United States for review and comment, a plan to ensure the availability of housing vouchers to accommodate Target Population members. The State will implement the plan by August 31, 2026. Before implementing its plan, the State must make any revisions necessary to obtain the Monitor's approval.

2.    <u>Housing Vouchers for At-Risk Population Members.</u> By October 31, 2025, the State will provide access to State-funded housing vouchers to At-Risk Population members.

3.    <u>Housing Navigation.</u> By October 31, 2025, the State will expand:

a.    The geographic coverage of Housing Navigation Services so that Target Population members across the State have meaningful access to appropriate housing options in locations suitable to their needs; and

b.    Eligibility for Housing Navigation Services to At-Risk Population members who require these services.

4.    <u>Home Modifications.</u> By August 31, 2025, the State will have (a) simplified and streamlined the process for approving Home Modifications; (b) allowed for Home Modifications to be completed before Institutionalized Population members receive HCBS waiver services when necessary to facilitate living in the Community; and (c) funded such Home Modifications before receipt of HCBS waiver services.

5.    <u>Tenancy Supports.</u> By October 31, 2025, the State will submit to CMS an application to provide tenancy supports to Target Population members utilizing a State-funded housing voucher.

6.    <u>New Construction Accessibility Requirements.</u> By August 31, 2025, the State will require affordable housing developers who receive federal funds or Transformational Affordable Housing Grant Program grant funds from the State's Department of Local Affairs, Division of Housing, for rental housing construction to include (a) at least 10 percent of newly constructed units to be fully accessible to members who use wheelchairs and (b) at least 4 percent of newly constructed units to be fully accessible to members with hearing and/or visual impairments.

7.    <u>Coordination with CHFA.</u> The State shall seek input from, and collaborate with, the Colorado Housing and Finance Authority ("CHFA"), and any relevant state, regional, or local entities, such as public housing authorities, in implementing and executing the provisions of this Agreement. By April 30, 2025, to facilitate this collaboration, the State will hire a housing manager to operate within HCPF and assist in housing related initiatives, programs, and policies necessary to execute this Agreement, including by discussing with CHFA leveraging the State's Low-Income Housing Tax Credit program for this purpose.

J.    <u>Records.</u>

1.    The State will record and maintain the information related to its implementation of this Section, including:

a.    For each Target Population member referred to Housing Navigation Services, the date of the request, and the date the member's lease is executed, if any;

b.    For each Target Population member who has requested a Home Modification, the request submission date, and the date the modification is completed;

c.    Target Population members who have received a Rapid Referral or Transition Coordination Services and who are residing in newly constructed units that are accessible to individuals who use wheelchairs;

d.    Target Population members who have received a Rapid Referral or Transition Coordination Services and who are residing in newly constructed units that are accessible to individuals with hearing and/or visual impairments;

e.    For each federal or state housing voucher issued to a Target Population member who has received a Rapid Referral or Transition Coordination Services, the date of issuance, the date the member's lease is executed, and the member's geographic location;

f.    Housing navigators' monthly reports, including the numbers of Target Population members assigned and placed into housing and their locations, status updates on members pending placement, obstacles to placement, and requests for technical assistance; and

g.    Complaints the State receives concerning the adequacy of Community-Based Services and Provider availability, including availability of contingency services, for At-Risk and Institutionalized Population members that are escalated to the HCBS Escalation Team or are otherwise referred to the State.

2.    The State will maintain data sufficient to readily calculate, for any monthly period, (a) the number of Target Population members authorized to receive each type of Community-Based Service, (b) the number of units of each Community-Based Service that Target Population members were authorized to receive, (c) the number of Target Population members who utilized each type of Community-Based Service, (d) the number of units of each Community-Based Service that Target Population members utilized, and (e) for each type of Community-Based Service the average amount of time between authorization and receipt. The State need not include the totals in (a) or (b) in its regular biannual reporting described in Section XI(D). The Monitor may request the data in subparts (a) or (b) if the Monitor deems it necessary to perform the Monitor's duties as set forth in this Agreement. This data shall not form the sole basis of a finding of

noncompliance with the terms of this Agreement, but may be considered along with other sources of information.

## IX.    QUALITY ASSURANCE AND PERFORMANCE IMPROVEMENT

A.    <u>Quality Assurance and Performance Improvement.</u> By June 30, 2025, the State will develop and implement a Quality Assurance and Performance Improvement ("QA/PI") system that collects and analyzes data relevant to assessing compliance with this Agreement. The QA/PI system will be developed to allow the State to verify data reliability and validity, analyze data to ensure outcomes are being achieved, evaluate processes and systems used to implement outcomes over time, and support data-driven decision-making.

    1.    <u>Purpose.</u> The QA/PI system will enable the State (a) to assess whether Target Population members are receiving the services described in this Agreement sufficient to live in, transition to, and remain in the Community; and (b) to study and improve processes so that Target Population members achieve positive outcomes aligned with the goals of this Agreement: community integration, independence, and self-determination.

    2.    <u>Data Collection and Analysis.</u> The State will develop a data collection plan to track the following:

        a.    Evaluation of outcomes outlined in this Agreement;

        b.    Identification of trends, patterns, strengths, barriers, and problems at the individual, Provider, and systemic levels, including, but not limited to, screening and diversion from nursing facility admission, quality of services, service gaps, accessibility of services, serving members with significant or complex needs, and the discharge and transition processes;

        c.    Development and implementation of preventative, corrective, and improvement measures to identify and address identified problems, and to build on successes and positive outcomes; and

        d.    Tracking of efficacy of preventative, corrective, and improvement measures and revise measures as needed.

    3.    <u>Access.</u> The State will ensure that all relevant State agencies serving members with disabilities have access to the data collected under this Agreement.

B.    <u>QA/PI Methodology</u>. By April 30, 2026, the State, with the Monitor's assistance, will begin developing the capacity to adopt and implement the Monitor's compliance assessment methodology as described in Section X(B)(3) below such that the State, after this Agreement terminates, will be able to continue assessing the quality and sufficiency of Community-Based Services, In-Reach, and the processes required in this Agreement. The State will demonstrate that it has developed this capacity before the Agreement terminates.

## X.    MONITOR

A.    <u>Selection of the Monitor.</u>

1.    <u>Monitor.</u> Melanie Reeves Miller will be the Monitor.

2.    <u>Process for Replacement of Monitor.</u> If the Monitor resigns or if the Parties agree that they wish to replace the Monitor, then the Parties will jointly select a proposed replacement Monitor. If the Parties are unable to agree on a proposed replacement Monitor within 60 days of receiving notice of the Monitor's resignation pursuant to Section X(B)(9) or within 60 days of the Parties' agreement to replace the Monitor, then each Party will, within 67 days of the resignation notice or agreement, (a) nominate up to three individuals with relevant expertise; and (b) submit those individuals' names to the Court so that the Court may select a replacement Monitor. The Parties will work with deliberate speed to identify potential replacement Monitors in advance of these deadlines.

B.    <u>Monitor's Role and Responsibilities.</u>

1.    <u>Monitor's Role.</u> Throughout the term of this Agreement, the Monitor will gather, analyze, and report on data reflecting the State's progress in implementing this Agreement. The Monitor will pursue a problem-solving approach to resolve amicably any disagreements that arise between the Parties, so that the Parties can focus on compliance with the Agreement.

2.    <u>Access to Information.</u> The Monitor and any staff or consultants working with the Monitor will have full access to the people, places, and documents that are necessary to assess the State's implementation of the Agreement, as permitted by law. However, the State has no obligation to (a) require any individual who is not a State employee or contractor to speak with the Monitor or (b) produce any document that is not within the control or custody of the State.

3.    <u>Assessment Methodology Plan.</u> The Monitor will consult with the Parties and submit a written plan on the methodologies the Monitor will use to assess implementation of the Agreement. The Monitor will submit the written plan to the Parties for review, and the Parties will provide the Monitor with any comments on the plan within 30 days of receiving the plan.

4.    <u>Individual Case Reviews.</u> In addition to reviewing and analyzing data, the Monitor may assess the implementation of the Agreement, including the quality and sufficiency of the services described in this Agreement, by regularly reviewing sufficient samples of Target Population members, including through first-person interviews.

5.    <u>Written Annual Reports.</u> The Monitor will submit to the Parties comprehensive reports on the State's progress in implementing the terms of the Agreement. The Monitor's reports may include recommendations for future implementation. The first annual report will cover the one-year period ending on the first anniversary of the Effective Date, and the subsequent reports will cover the following one-year periods. The Monitor will submit each annual report 60 days after the end of the period it covers —

except, however, that the Monitor will submit the fourth report 60 days *before* the end of
the period it covers. At least 30 days before the Monitor submits any final report, the
Monitor will provide a draft of the report to the Parties for comment. In finalizing each
report, the Monitor will consider Parties' comments.

6.      <u>Technical Assistance.</u> The Monitor may provide technical assistance relating to
any aspect of this Agreement to anyone with a role in implementation.

7.      <u>Monitor's Authority</u>. In completing these responsibilities, the Monitor may:

      a.      Hire staff and consultants as necessary to help carry out the Monitor's
      duties and responsibilities. The Monitor will provide notice and consult with the
      Parties on any subcontracting.

      b.      Require relevant data or records maintained by the State that are necessary
      for the Monitor's performance of his or her duties under this Agreement,
      including, but not limited to, a Target Population member's service plans and
      contingency back-up plans.

      c.      Enter, with or without advance notice, any part of any facility or program
      providing services to Target Population members and interview, on a confidential
      basis or otherwise, individuals with knowledge pertinent to compliance with this
      Agreement. Staff and consultants of the Monitor shall also have this authority.
      The State will facilitate the Monitor's access if a facility or program denies entry.

      d.      Communicate with a Party, counsel, agents or staff of a Party, or anyone
      else the Monitor deems necessary for completing his or her responsibilities. The
      Monitor will have the authority to convene meetings with the Parties as
      appropriate.

      e.      In the Monitor's sole discretion, and recognizing the Monitor's authority
      as set forth in this Section, the Monitor may provide advance notice to the Parties
      of the Monitor's communications with members, stakeholders, Providers, and
      other entities. Neither Party will interfere with, or exert control over, the
      Monitor's communications.

      f.      Review individual files and other data the State and its contracted entities
      maintain and interview Target Population members, Providers, Case Managers,
      Transition Coordinators, In-Reach Counselors, and relevant State staff.

      g.      Review documentation submitted to or created by the HCBS Escalation
      Team.

      h.      If legal action is taken between the Parties as related to the Letter of
      Findings, the Case, or this Agreement, testify about any matter relating to the
      implementation, enforcement, or dissolution of the Agreement, including, but not
      limited to, the Monitor's observations, findings, and recommendations in this
      matter.

Docusign Envelope ID: E064C111-FD86-4662-87B3-E15A735B2463

8.      Limitations. The Monitor, and any staff or consultants retained by the Monitor, will not:

        a.      Subject to Colo. Rev. Stat. § 24-106-109, be liable for any claim, lawsuit, or demand arising out of their lawful activities under this Agreement. This paragraph does not apply to any proceeding for payment or breach under contracts into which they have entered in connection with their work under the Agreement.

        b.      Enter, while serving as the Monitor or for a period of one year after the termination of this Agreement, into any new contract with the State or the United States, unless the other Party consents in writing.

        c.      Other than testifying as set forth in Section X(B)(7)(h), testify in any other litigation or proceeding with regard to any act or omission of the State or any of its agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement.

9.      Notice of Resignation. If at any point during this Agreement the Monitor intends to resign, the Monitor will give the Parties at least 30 days' notice of resignation.

C.      Monitor's Budget.

1.      Budget. The Parties agree that the annual budget for the Monitor will be $350,000.00 per year, including the costs of any staff or consultants the Monitor may hire. At any time during the pendency of this Agreement, the Monitor may submit to the State a request for a budget increase, along with any explanation of the reason for the proposed increase. The State will review and respond to the request within 30 days. The State will not unreasonably deny requests for a budget increase.

2.      State to Bear Costs. Subject to the State's fiscal and procurement rules, the State will bear the cost of the Monitor, but the Monitor and any staff or consultants the Monitor may hire, are not State agents.

D.      Confidentiality. The Monitor will comply with all federal and State patient rights and confidentiality laws and regulations, including, but not limited to: the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); the Standard for Privacy of Individually Identifiable Health Information and Health Insurance Reform: Security Standards, 45 C.F.R. Part 164; alcohol and drug abuse patient records laws codified at 42 U.S.C. § 290dd-2 and 42 C.F.R. Part 2; and the Health Information Technology for Economics and Clinical Health Act ("HITECH Act") adopted as part of the American Recovery and Reinvestment Act of 2009 (Public Law 111-5).

*U.S. v. Colorado*, No. 1:23-cv-2538 (D. Colo.)
Settlement Agreement

Page 25 of 32

## XI.    IMPLEMENTATION

A.    <u>Settlement Agreement Coordinator.</u> Within two weeks after the Effective Date, the State will appoint a Settlement Agreement Coordinator. The Settlement Agreement Coordinator will: (1) lead the State's efforts to comply with the terms of this Agreement; (2) have sufficient authority to direct State personnel to the extent necessary to implement the terms of this Agreement; and (3) coordinate the State's Agreement related activities and its communications with the United States and the Monitor.

B.    <u>Stakeholder Engagement.</u> The State will engage with stakeholders to consider their recommendations and assess the impact and efficacy of measures and policies relevant to this Agreement.

C.    <u>HCBS Escalation Team.</u> Through HCPF, the State will create a team at the State level to help Transition Coordinators and Case Managers overcome barriers preventing Community Transition, Diversion, and Rapid Reintegration. This HCBS Escalation Team will include individuals with expertise in resolving problems that arise during Transition Planning and Diversion Planning.

D.    <u>Regular Reports.</u> The State will provide regular reports on the data and records set forth in Sections V(D), VI(L), VII(G), and VIII(J). The first report will be provided by October 15, 2025. Subsequent reports will be provided every six months thereafter, except in 2028, when the State will provide a single, final report by June 15, 2028. Within 45 days of receipt of any such report from the State, the United States may request additional data or records (not otherwise available from the Monitor) related to the report. The United States may make additional reasonable requests for data or records from the State two times a year. The State shall have 45 days from the date of a United States' request to produce the requested data or records. Nothing herein shall preclude the Parties from requesting data or records in the Monitor's possession directly from the Monitor throughout the term of this Agreement.

E.    <u>Meetings of the Parties.</u> The Parties and the Monitor will meet once every three months to discuss the status of compliance with the Agreement.

F.    <u>Status Conference Before the Court.</u> In the joint motion described in Section XIV(B), the Parties will request that the Court include in its order (1) a status conference to be held two years into the term of the Agreement, and (2) permission for the Parties, by agreement, to request cancellation of that status conference and to submit a joint written status report in lieu of attendance.

## XII.    FUNDING

A.    <u>Subject to Annual Appropriation.</u> The State represents that it is prohibited by Colorado law from making commitments beyond the term of the current State fiscal year, and, while empowered to enter into and implement this Agreement, it does not have the legal authority to bind the Colorado General Assembly, which has the authority to appropriate funds for, and amend laws pertaining to, the State's Medicaid program. The State agrees to seek funding necessary as provided in this Agreement and as necessary to implement and comply with this Agreement. However, nothing herein shall constitute a multiple fiscal year obligation pursuant to

Colorado Constitution article X, section 20. Notwithstanding any other provision of this Agreement, the State's obligations under this Agreement that extend beyond the Effective Date of this Agreement are contingent upon funds being appropriated, budgeted, and otherwise made available for the purpose of this Agreement and subject to annual appropriation.

B.    Lack of Necessary Appropriation.

1.    If the State is unable to obtain necessary appropriations to implement and comply with the terms of this Agreement this year or in any future fiscal year, this Agreement shall be unenforceable as to those terms and provisions. Nothing in this paragraph is intended to prohibit the United States from enforcing, consistent with this Agreement, those provisions of the Agreement that the General Assembly has adequately funded or enacted, but with which the State is nevertheless not in substantial compliance.

2.    If the State asserts that a legislative appropriation, action, or inaction presents a barrier to compliance with one or more provisions of this Agreement, the following will occur:

a.    The State will promptly document that assertion in writing to the United States, naming the specific provisions affected within this Agreement and providing supporting evidence. If possible, the State will propose a written plan to achieve compliance with the provision(s).

b.    The United States may make a counterproposal or accept the State's written plan. If the Parties reach agreement, they will modify the Agreement as set forth in Section XIV(C)(2).

c.    If the Parties cannot reach agreement on a revised plan for continued implementation of the affected provisions at a reasonable pace, the United States may withdraw its consent to the Agreement and the Parties may revive any claims or defenses otherwise barred by its operation.

## XIII.    GENERAL PROVISIONS

A.    Binding Agreement. This Agreement is binding on the Parties, by and through their officials, agents, employees, and successors for the term of this Agreement. The State will align the terms of any such contracts with its obligations under this Agreement and will ensure that contracted parties and agents take all actions necessary for the State to comply with the provisions of this Agreement.

B.    Protections Against Retaliation for Complainants, Witnesses, and Whistleblowers. The State will not retaliate against any individual who (1) opposes any act or practice that violates this Agreement, (2) has made or may make a complaint related to this Agreement, or (3) has testified or may testify, has assisted or may assist, or has participated or may participate in any manner in an investigation, proceeding, or hearing related to this Agreement. The State will timely and thoroughly investigate any allegations of such retaliation and take any appropriate corrective actions. Unless prohibited by law, the State will promptly report to the Monitor these allegations of retaliation.

C. <u>Protections Against Coercion and Retaliation for Target Population Members.</u>  The State will take corrective action if notified that members of the Target Population are (1) pressured to choose nursing facility services, (2) pressured to decline Community-Based Services, or (3) subjected to any form of retaliation by nursing facilities, hospitals, State staff, or State contractors, for seeking alternatives to facility-based care.

D. <u>Voluntary Settlement.</u> The Parties represent and acknowledge that this Agreement is the result of extensive, thorough, and good faith negotiations. The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel. Each Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of a Party is duly authorized to enter into this Agreement and to bind that Party to the terms and conditions of this Agreement.

E. <u>Third Parties Involved in Implementation.</u> The Parties acknowledge that either Party may contact or speak alone with any third party involved in the implementation of this Agreement, including but not limited to nursing facility staff and residents, Providers, Case Managers, Transition Coordinators, and In-Reach Counselors. However, the State has no obligation to require any third party who is not a State employee or contractor to speak with the United States. For the purposes of this section, the term "contractor" does not include Providers.

F. <u>No Admission of Liability.</u> Nothing in this Agreement shall be construed as an acknowledgment, an admission, or evidence of liability of the State under the ADA, the holding in *Olmstead*, the United States or State Constitution, or any federal or state law. This Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

G. <u>No Third-Party Beneficiaries.</u> No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly no person or entity may assert any claim or right as a beneficiary under this Agreement in any civil, criminal, or administrative action.

H. <u>Cost and Expenses.</u> The United States and the State will each bear the cost of its own fees and expenses incurred in connection with this Agreement.

I. <u>Choice of Law and Venue.</u> This Agreement shall be interpreted in accordance with federal laws and the laws of the State of Colorado. The Case before the Court shall be the exclusive forum for all legal actions, judicial proceedings, and judicial remedies concerning this Agreement.

## XIV. CONSTRUCTION AND TERMINATION

A. <u>Effective Date.</u> The "Effective Date" will be the date on which the Parties fully execute this Agreement.

B. <u>Retention of Jurisdiction.</u> Upon execution of this Agreement, the Parties shall file a joint motion with the Court pursuant to D.C.COLO.LCivR 41.2, requesting that the Court administratively close the Case and retain jurisdiction to enforce the Agreement, including subsequent modifications to the Agreement pursuant to Section XIV(C)(2). In the event that the

Court does not retain jurisdiction, this Agreement shall be null and void and the Parties have the right to revive any claims or defenses otherwise barred by operation of this Agreement.

C.    Term, Changes to Term, and Other Modifications.

    1.    Base Term. The State will begin implementing this Agreement immediately. The term of this Agreement is four years, subject to any terminations or extensions.

    2.    Modifications in Writing. The Parties may jointly modify the Agreement for any reason, but only in a signed writing. The Parties will file any such modifications with the Court, other than modifications of any timeframes or deadlines for completion of an act due before the Agreement's scheduled termination date. If necessary, the Parties will simultaneously request that the Court extend jurisdiction over the Agreement as modified.

    3.    Post Monitor Study Conferral. If it is determined, pursuant to Section VI(F)(8), that fewer than 450 remaining Institutionalized Population members meet the criteria described in that Section, then the Parties will meet and confer to discuss, in consultation with the Monitor, whether the State is in substantial compliance with the Agreement as a whole. If the Parties agree in writing that the State is in substantial compliance with the Agreement as a whole, then the Agreement will terminate at that time. If the Parties do not agree that the State is in substantial compliance with the Agreement as a whole, then the State may file a motion to find the State to be in substantial compliance with the Agreement as a whole. In such a proceeding, the State will have the burden to prove that it is in substantial compliance with the Agreement as a whole. If the Court determines that the State is in substantial compliance with the Agreement as a whole, then the Agreement will terminate on the date of the Court's order.

D.    Scheduled End of Term.

    1.    Termination Due to Substantial Compliance. If the Agreement is not terminated early pursuant to Section XIV(C)(3), and if the Parties agree as of the last day of the Agreement's term that the State is in substantial compliance with the Agreement, then the Agreement will expire as scheduled.

    2.    Noncompliance. If the United States believes that as of the last day of the Agreement's term that the State will be out of compliance with the Agreement, and if the Parties cannot agree on a modification to the Agreement resolving this noncompliance, then the United States may file a motion submitting the dispute to the Court, seeking relief for the noncompliance, and requesting that the Court schedule a proceeding to adjudicate the dispute. The State will have the burden to demonstrate substantial compliance if disputed, and the Agreement's term will not expire while the proceeding is pending. The United States may file such a motion during the last six months of the Agreement's term.

E.    Substantial Compliance. For purposes of this Agreement, "Substantial Compliance" will mean something less than strict or literal compliance, consistent with applicable law. Noncompliance with mere technicalities, or isolated or temporary failure to comply during a

period of otherwise sustained compliance will not constitute failure to maintain Substantial
Compliance.

F.    <u>Impossibility.</u> Noncompliance with this Agreement due to circumstances outside of the
State's control that are unanticipated, unpreventable, and unavoidable will not constitute a breach
of this Agreement.

G.    <u>Dismissal of the Case and Release of Claims.</u> Within 30 days of the termination of this
Agreement, the Parties shall file a Joint Motion to Dismiss the Case with Prejudice. Upon
dismissal of the Case, the United States releases and discharges the State from liability, known or
unknown, for all ADA and Section 504 claims of the United States Attorney General described in
the Letter of Findings and the Complaint, pleaded in the Complaint, or resolved by this
Agreement. The United States represents that it has authority to deliver this release and that this
release shall be effective.

H.    <u>Informal Dispute Resolution.</u> The Parties agree to work collaboratively to achieve the
purpose of this Agreement and will attempt to resolve informally any disputes that may arise.
This includes timely responses to reasonable information requests related to the dispute. If a
dispute arises over the language or construction of this Agreement or its requirements, the Parties
agree to meet and confer in an effort to achieve a mutually agreeable resolution before initiating
any judicial proceeding. Either party may request the assistance of the Monitor to help the Parties
informally resolve a dispute.

I.    <u>Formal Dispute Resolution.</u>

1.    If the United States believes that the State is failing to achieve substantial
compliance with any obligation of this Agreement that is due before the Agreement's
scheduled termination date, then:

a.    The United States will request a meeting with the State and the Monitor to
determine whether the Parties can agree on how to resolve the alleged
noncompliance.

b.    If the Parties are unable to reach an agreement through the meeting
described above, the United States will notify the State in writing of the alleged
failure and request that the State correct the alleged failure. The State will have 45
days to respond to the United States in writing.

c.    In such written response, the State will, for each allegation of failure to
achieve or maintain substantial compliance, either (i) accept (without necessarily
admitting) the allegation of noncompliance and propose a curative action plan
describing all steps that the State will take to cure the noncompliance and by
when it will take these steps; or (ii) deny noncompliance.

d.    If the State responds in a timely manner and proposes a curative action
plan, then the United States may accept the State's proposal or offer a
counterproposal for a different curative action plan. If the Parties reach an

agreement that varies from the Agreement's provisions, the new agreement will be in writing and signed, consistent with the terms of Section XIV(C)(2).

e.     If the State fails to respond to the United States' notification of alleged noncompliance within 45 days, denies any one or more allegations of noncompliance, or the Parties fail to reach agreement on a curative action plan within a reasonable amount of time, the United States may seek a judicial remedy.

2.     If the United States believes that any alleged noncompliance of the Agreement poses an immediate and serious risk to the life, health, or safety of a Target Population member, then the United States will notify the State of the issue so that the State may immediately remediate the risk to life, health, or safety. If the State does not do so, the United States may seek a judicial remedy immediately.

3.     The dispute resolution process in Section XIV(I)(1) does not apply when the United States believes that the State is not in substantial compliance with any obligation of this Agreement as of the Agreement's termination date. In that event, the United States may seek a judicial remedy pursuant to Section XIV(D)(2).

J.     <u>Third-Party Challenges.</u> The Parties shall promptly notify each other of any judicial or administrative challenge to this Agreement or any portion thereof, and shall defend against any challenge to the Agreement.

K.     <u>Failure to Enforce Not a Waiver.</u> Failure to enforce any deadline or other provision of this Agreement shall not be construed as a waiver of any enforcement rights.

L.     <u>Documentation of Implementation Efforts.</u> The State shall maintain relevant data or records that are necessary to document the implementation of this Agreement.

M.     <u>Litigation Holds.</u> For purposes of the Parties' preservation obligations under Federal Rule of Civil Procedure 26, as of the Effective Date, litigation is not "reasonably foreseeable" about the matters described in the Letter of Findings and the Case. To the extent that either Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in the Letter of Findings and the Case, the Party need not maintain the litigation hold.

N.     <u>Notice.</u> Any notices necessary under this Section shall be sent by electronic mail to the recipient's counsel of record.

O.     <u>Calendar Days.</u> Any mention of "days" in this Agreement refers to calendar days unless the Agreement states otherwise.

P.     <u>Severability.</u> Unless otherwise stated in this Agreement, if any portion of this Agreement is determined void or unenforceable, then the remainder of the Agreement will remain valid and enforceable.

*U.S. v. Colorado*, No. 1:23-cv-2538 (D. Colo.)
Settlement Agreement

Page 31 of 32

FOR PLAINTIFF

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief
ANNE S. RAISH
Principal Deputy Chief
JENNIFER K. McDANNELL
Deputy Chief

*Julia Graff*

JULIA M. GRAFF
H. JUSTIN PARK
JENNIFER ROBINS
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dated: October 31, 2024

FOR DEFENDANT

COLORADO DEPARTMENT OF HEALTH
CARE POLICY AND FINANCING

*K Bimestefer*

Kim Bimestefer
Executive Director
303 E. 17th Avenue
Denver, CO 80203

Dated: October 31, 2024

COLORADO DEPARTMENT OF LOCAL
AFFAIRS

*Alison George*

Alison George
Director of Division of Housing
1313 Sherman Street, Suite #518
Denver, CO 80203

Dated: October 31, 2024

APPROVED AS TO FORM:

FOR THE DEPARTMENTS

PHILIP J. WEISER
Attorney General

*Ryan Lorch*

JENNIFER L. WEAVER, 28882
CORELLE M. SPETTIGUE, 39208
JUSTINE M. PIERCE, 43930
RYAN K. LORCH, 51450
1300 Broadway, 6th Floor
Denver, CO  80203
State Services Section

Dated: October 31, 2024